FILED IN CLERK'S OFFICE
U.S.D.C. - Rome

JUL 20 2005

LUTHER D. THOMAS, Clerk
By: _____
                Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

ECONOMY PREMIER ASSURANCE
COMPANY and METLIFE AUTO AND
HOME,

        Plaintiffs,

    v.

STEVEN DAVIS, PEGGY DAVIS,
JOSHUA DAVIS, C.C. and L.C.
Individually, and as Next
Friends of M.C. and C.C.,
their Minor Children,

        Defendants.

CIVIL ACTION

NO. 4:04-CV-287-RLV[1]

## O R D E R

The plaintiffs filed this action seeking a declaratory judgment concerning their obligation to defend and indemnify Steven, Peggy, and Joshua Davis in a lawsuit pending in the Superior Court of Bartow County, Georgia, Civil Action Number CV-04-2344 (the "underlying lawsuit"). This matter is before the court on the plaintiffs' motion for summary judgment [Doc. No. 20] and the defendants' C.C. and L.C., Individually and as Next Friends of M.C. and C.C., motion for summary judgment [Doc. No. 28].

I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On August 27, 2004, defendants C.C. and L.C. (the "C's") filed a complaint against Steven Davis, Peggy Davis, and Joshua Davis

---

[1] Both parties are directed to amend their civil action number to reflect that this case is now before Judge Vining.

1

(collectively the "Davises") both individually and in their capacity as parents and next friends of their children M.C. and C.C. (the "C's children").  In the underlying lawsuit, the C's contend that since they were required to be away from their home several nights a week for work and education pursuits, they asked their neighbors Steven and Peggy Davis to babysit their two minor children beginning in the fall of 2002.  Steven and Peggy Davis agreed to babysit the C's children and were paid for their services.  The C's children were six (M.C.) and four (C.C.) in the fall of 2002 and were eight (M.C.) and six (C.C.) at the time the underlying lawsuit was filed in August 2004.

In the underlying lawsuit, the C's contend that beginning on the very first night of the babysitting arrangement and continuing on a number of occasions until January 2004, Steven and Peggy Davis failed to watch, supervise, protect, and care for the C's children who had been temporarily placed in their custody.  Specifically, the suit alleges that Steven and Peggy Davis abandoned the C's children, leaving them in the sole custody of their son, Joshua Davis, who was twelve years old in the fall of 2002 and fourteen years old at the time the underlying lawsuit was filed.  The C's contend that Steven and Peggy Davis made no further effort to watch, protect, supervise, protect, or care for the C's children.

Moreover, the underlying lawsuit contends that on each of the occasions Steven and Peggy Davis left the C's children under the

supervision of their son, Joshua brutalized and sexually molested the children. Specifically, the suit contends that Joshua forced the children into a specific room, where he made them take off their clothing and then performed repeated acts of rape, sexual assault, aggravated sexual battery, sodomy, and aggravated child molestation on the two minor children. The C's further contend that Joshua threatened their children by telling them that he would seriously harm them if they left the room while he was brutalizing them or if they attempted to tell their parents about the acts he was perpetrating on them. Thus, both of the C's children were forced to witness the acts committed on the other during each of the approximately twenty-two occasions Joshua allegedly physically and emotionally harmed them while Steven and Peggy Davis left the C's children under Joshua's supervision beginning in the fall of 2002 and ending in January 2004.

In the underlying lawsuit, the C's assert the following claims against Joshua Davis: (1) assault, (2) battery, (3) false imprisonment, (4) intentional infliction of emotional distress, (5) negligence, (6) recklessness, and (7) negligent infliction of emotional distress. Furthermore, the C's sue Steven and Peggy Davis for: (1) negligence, (2) negligent failure to warn, (3) recklessness, and (4) vicarious liability for the acts of their son.

The plaintiffs, Economy Premier Assurance Company and MetLife

Auto and Home, which the plaintiffs refer to collectively as ("MetLife"), brought the current declaratory judgment action to determine whether they are obligated to defend and indemnify Steven, Peggy, and Joshua Davis in the underlying lawsuit under the terms of the Metropolitan Value Insurance Protection Plus Homeowner's Policies (the "Policies") issued to Steven L. Davis. MetLife concedes that the Policies, which are identical in all relevant aspects, other than their dates of coverage, were in effect from June 30, 2002, through June 30, 2004.[2]  The Policies provide personal liability limits in the amount of $300,000 per occurrence.

In their motion for summary judgment, the plaintiffs argue that under the language of the Policies, they have no duty to defend or indemnify the Davises on any of the claims brought against them.  In their motion for summary judgment, the C's contend that the plaintiffs do have a duty to defend and indemnify Joshua Davis for the false imprisonment claim brought against him, but do not oppose the plaintiffs' motion that they need not provide coverage or a defense for the C's assault, battery, and intentional infliction of emotional distress claims.  Furthermore, the C's contend that the Policies cover Steven and Peggy Davis' negligent acts separately from the intentional acts of their son, Joshua.

---

[2] The original policy, policy number 2603586250 had a policy period of June 30, 2002, through June 30, 2003, and was renewed for the subsequent year June 30, 2003, through June 30, 2004.

Finally, both parties dispute whether the plaintiffs must provide coverage for the C's punitive damages claim and also, if the plaintiffs are obligated to defend and indemnify the plaintiffs, how many "occurrences" arose from the Davises' conduct.

## II.   LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  The party seeking summary judgment bears the burden of demonstrating that no dispute as to any material fact exists.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 156, 90 S.Ct. 1598, 1608 (1970); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).  The moving party's burden is discharged merely by "'showing' -- that is, pointing out to the District Court - that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986).  In determining whether the moving party has met this burden, the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion.  Johnson, 74 F.3d at 1090.  Once the moving party has adequately supported its motion, the nonmovant then has the burden of showing that summary judgment is improper by

5

coming forward with specific facts showing a genuine dispute. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986).

In deciding a motion for summary judgment, it is not the court's function to decide genuine issues of material fact but to decide only whether there is such an issue to be tried.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 106 S.Ct. 2505, 2511 (1986).  The applicable substantive law will identify those facts that are material.  Anderson, 477 U.S. at 247, 106 S.Ct. at 2510. Facts that in good faith are disputed, but which do not resolve or affect the outcome of the case, will not preclude the entry of summary judgment as those facts are not material.  Id.

Genuine disputes are those by which the evidence is such that a reasonable jury could return a verdict for the nonmovant.  Id. In order for factual issues to be "genuine" they must have a real basis in the record.  Matsushita, 475 U.S. at 586, 106 S.Ct. at 1356.  When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."  Id.

### III.  DISCUSSION

This court is mindful of the discretionary nature of declaratory judgment actions and the United States Court of Appeals for the Eleventh Circuit's recent opinion in Ameritas Variable Life Ins. Co. v. Roach, No. 05-10307, 2005 WL 1385212 (11th Cir. June

13, 2005). Nevertheless, because the issue of coverage has seemingly not been raised in the underlying lawsuit and because the defendants have not filed any motion challenging this court's determination of this matter, this court will proceed with adjudicating whether the plaintiffs must defend and indemnify the Davises.

Courts interpreting insurance policies in accordance with Georgia law are directed to construe the policies in the manner in which they were drafted if the contract is ambiguous. Pilz v. Monticello Ins. Co., 267 Ga. App. 370, 371-72, 599 S.E.2d 220, 221-22 (2004). However, any ambiguity in an insurance policy is to be construed against the insurer. Id. Additionally, courts must look to the allegations contained in the complaint, rather than the merits of those claims, when determining whether insurance companies have a duty to defend claims. Cantrell v. Allstate Ins. Co., 202 Ga. App. 859, 859-60, 415 S.E.2d 711, 712 (1992).

A.  Joshua Davis

In their briefs, both parties discuss only the assault, battery, intentional infliction of emotional distress, and false imprisonment claims brought against Joshua Davis. It should briefly be noted that the Policies specifically provide that bodily injury does not include the actual, alleged, or threatened sexual molestation of a person. Since the C's readily concede that the Policies do not cover their assault, battery, molestation, and

7

intentional infliction of emotional distress claims against Joshua Davis, this court will focus only on whether the plaintiffs must defend and indemnify the C's false imprisonment claim.

Section II of the Policies provides coverage for "Personal Injury."    Policies,    Coverage  25.    However,  an  Amendatory Endorsement added to the Policies deleted this language under Section II and, instead, replaced it with the following provisions:

> **Coverage F - Personal Liability**
>
> **We** will pay all sums for **bodily injury, property damage** and **personal injury** to others for which the law holds **you** responsible because of an **occurrence**. This includes pre-judgment interest awarded against **you**.

Amendatory Endorsement, ¶ 12.  The Amendatory Endorsement also adds the term "Personal Injury" under the General Definitions portion of the Policies and provides:

> **"PERSONAL INJURY"** is defined as injury arising out of one or more of the following:
>
> 1.  False arrest, false imprisonment, wrongful detention or malicious prosecution;
>
> 2.  Wrongful eviction or wrongful entry; or
>
> 3.  Libel, slander, defamation of character or invasion of privacy.

Amendatory Endorsement, ¶ 2.  "Occurrence," in turn, is defined in the following manner:

> **"OCCURRENCE"** means an accident, including continuous or repeated exposure to substantially the same harmful conditions, resulting in **bodily injury** or **property damage** during the term of the policy.

8

Policies, General Definitions.  Finally, the Amendatory Endorsement provides the only exclusions applicable for personal injury:

> Under **personal injury, we** do not cover: . . .
>
> 2.  injury caused by a violation of a penal law or ordinance committed by you or with your knowledge or consent.

Amendatory Endorsement, ¶ 13(B).  Thus, while it is clear that false imprisonment is defined in the Policies as a personal injury, the personal injury must be because of an occurrence.  The plaintiffs contend that Joshua Davis's actions could not possibly constitute an occurrence because he acted intentionally when confining the children in a room before sexually assaulting them. The C's recognize that false imprisonment is an intentional tort and not a tort of negligence.  See O.C.G.A. § 51-7-20 and Williams v. Smith, 179 Ga. App. 712, 713, 348 S.E.2d 50, 52 (1986).[3]  They further realize that because false imprisonment is an intentional, rather than accidental, act, actions amounting to false imprisonment would necessarily fall outside the scope of an occurrence.  The C's also realize that because false imprisonment both creates a cause of action in tort, as well as conduct

---

[3] The plaintiffs point to Cantrell v. Allstate Ins. Co., 202 Ga. App. 859, 415 S.E.2d 711 (1992), and Pilz v. Monticello Ins. Co., 267 Ga. App. 370, 599 S.E.2d 220 (2004), for the proposition that false imprisonment cannot arise because of an occurrence because it is an intentional act.  This is not an issue.  If personal injury had not specifically included false imprisonment in its definition, these cases would be dispositive of this matter. However, given the inconsistencies in the contract, this court must proceed to determine which contradictory provision governs.

amounting to a crime,[4] there is an inherent conflict with the definition of personal injury and exclusion number two listed above.

Thus, essentially, although false imprisonment is clearly contemplated in the definition of personal injury, it is intentional and thus, not an "occurrence," and, otherwise, would be excluded from coverage because it is also punishable as a crime. This leads to the inevitable inquiry of why false imprisonment would be included in the scope of the definition of personal injury when it necessarily could never be covered because of the definition of occurrence and criminal exclusions. This court is not the first to encounter such a quandry. See Isdoll v. Scottsdale Ins. Co., 219 Ga. App. 516, 466 S.E.2d 84 (1995); Okehi v. St. Paul Fire and Marine Ins. Co., 161 Ga. App. 851, 289 S.E.2d 810 (1982); Licoln Nat'l Health and Cas. Ins. Co. v. Brown, 782 F.Supp. 110 (M.D. Ga. 1992).

In each of these cases the courts construed the terms of the policy against the insurance company and held that the insurance companies had to defend and indemnify the policyholders. To put it simply, it is both inconsistent and counterintuitive for insurance companies to specifically provide coverage for an intentional

---

[4]   O.C.G.A. § 16-5-41(a) provides, "A person commits the offense of false imprisonment when, in violation of the personal liberty of another, he arrests, confines, or detains such person without legal authority."

action, such as false imprisonment, and then, in the next breath, to limit this coverage by excluding all intentional actions which would necessarily include false imprisonment and all other intentional torts, many of which are also punishable under the criminal code. Therefore, because the Policies are at best ambiguous and at worst directly inapposite, this court will construe the Policies against the drafter and conclude that the plaintiffs are obligated to defend and indemnify the C's false imprisonment claim.

Next, the plaintiffs argue that the C's false imprisonment claim is just a last grasp at coverage because the C's are now aware that their original claims for assault, battery, and intentional infliction of emotional distress arising out of the molestation of their children are not covered by the Policies. In support of this contention, the plaintiffs point to the Supreme Court of Georgia's decision in Jefferson Ins. Co. of New York v. Dunn, 269 Ga. 213, 215, 496 S.E.2d 696, 698 (1998), which sets forth the genesis theory of determining whether certain claims are covered under insurance policies. Under the genesis theory, claims that otherwise would be covered under an insurance policy are excluded from coverage if those claims arise out of conduct that is otherwise not covered under the policy. Id.

In their motion for summary judgment, the plaintiffs argue that the C's claims for false imprisonment would not exist but for

the sexual abuse and molestation committed upon them by Joshua
Davis and, since claims for sexual abuse and molestation are not
covered, so too should the false imprisonment claim be excluded
from coverage.   This chicken or egg argument lacks credence.
First, it is more likely that Joshua Davis's false imprisonment of
the children enabled him to sexually assault them, rather than vice
versa.

Second, if Joshua Davis's conduct did constitute false
imprisonment, that conduct is distinguishable from his sexual
assault of the C's children.  The genesis theory precludes a claim
from attempting to gain coverage for conduct that would otherwise
be excluded from coverage if the claim seeks damages for the harm
caused by the excluded conduct.   These situations are distinct
because in the case at bar there are distinct claims seeking
compensation for distinct harms, whereas claims precluded by the
genesis theory have distinct claims seeking redress for the same
harm.  Though the plaintiffs argue that the C's false imprisonment
claim was added only after the C's realized their prior claims were
not covered, Cantrell provides that this court must look to the
allegations contained in the complaint and not the merits of such
claims.   Therefore, with respect to Joshua Davis, this court
concludes that the plaintiffs must defend and indemnify only the
C's false imprisonment claim against him.

B.  Steven and Peggy Davis

The C's asserted claims of negligent supervision, negligent failure to warn, and vicarious liability against Steven and Peggy Davis in the underlying lawsuit.  In the case at bar, the plaintiffs argue that since no claim can exist against Steven and Peggy Davis independent of the intentional acts of their son, the C's claims are barred by the genesis theory.  Dunn, 269 Ga. at 215, 496 S.E.2d at 698; Harden v. State Farm Fire & Cas. Co., 269 Ga. App. 732, 605 S.E.2d 37 (2004).

The C's counter that although their negligent failure to warn and vicarious liability claims may not be covered under the genesis theory, their negligent supervision claim is covered because the parents' negligence led to the C's children being falsely imprisoned.  In Harden, the Court of Appeals of Georgia was confronted with the issue of whether an insurance company was obligated to defend a negligent supervision claim against the wife of a man who sexually abused a minor child.  In that case, the court held that the insurance company was not obligated to defend the abuser's wife because there could be no claim against her but for the husband's intentional and, therefore, excluded, acts.  269 Ga. App. at 734-35, 605 S.E.2d at 39.

Thus, after Harden, this court concludes that the plaintiffs have no duty to defend the C's negligent failure to warn claim because that claim is necessarily based on their failure to warn

13

the C's of their son's propensity of sexually assaulting others, a claim clearly outside the scope of coverage. Furthermore, the plaintiffs have no duty to defend the C's negligent supervision and vicarious liability claims as far as those claims relate to Steven and Peggy Davis's failure to supervise the C's children which, in turn, caused them to be sexually assaulted by Joshua Davis. However, the plaintiffs are obligated to defend and indemnify the C's negligent supervision and vicarious liability claims as far as those claims relate to false imprisonment since that conduct is covered under the Policies.

C.   Punitive Damages

Next, the plaintiffs contend that they should not be forced to pay any judgment for punitive damages because the policy excludes coverage for intentional acts. This court has already concluded that the plaintiffs must defend and indemnify the C's false imprisonment claim. Furthermore, the Policies state that the plaintiffs "will pay all sums for bodily injury, property damage and personal injury to others for which the law holds you responsible because of an occurrence." In Georgia, if punitive damages are not explicitly excluded, and the coverage generally applies to damages, the insurance company can be forced to pay punitive damages. Lunceford v. Peachtree Cas. Ins. Co., 230 Ga. App. 4, 6-7, 495 S.E.2d 88, 90-91 (1997). Thus, in this instance, the plaintiffs are bound to pay any award of punitive damages

related to Joshua Davis's false imprisonment of the C's children. The plaintiffs will not, however, be bound to pay an award of punitive damages related to any other claim.

D.   Number of Occurrences

The parties next dispute how many "occurrences" arose from Joshua Davis's alleged false imprisonment of the C's children and Steven and Peggy Davis's alleged vicarious liability and negligence, which purportedly led to the C's children being falsely imprisoned.   The plaintiffs contend that since both of the C's children were allegedly falsely imprisoned at the same time, both injuries to each child stem from one proximate cause and, therefore, one single occurrence limit applies to both children for each policy year.   Therefore, the plaintiffs argue that this court should rule that the amount of insurance coverage available to the Davises for the C's claims is limited to the total amount of $600,000, or $300,000 for each policy year.

The C's counter that each separate act alleged to have been committed against each separate child by each defendant, constitutes a separate occurrence under the meaning of the Policies.   In the alternative, the C's contend that the Policies' language is ambiguous, as it could be read in differing ways and, therefore, should be left for a jury to determine.   As noted earlier,

> **"OCCURRENCE"** means an accident, including continuous or repeated exposure to substantially the same harmful

15

conditions, resulting in **bodily injury** or **property damage** during the term of the policy.

First, this court must address whether the definition of occurrence is ambiguous. In Georgia,

> [a]n issue of contract construction is at the outset a question of law for the court to be resolved by a three-step process. "The trial court must first decide whether the contract language is ambiguous; if it is ambiguous, the trial court must then apply the applicable rules of construction [via O.C.G.A. § 13-2-2]; if after doing so the trial court determines that an ambiguity still remains, the jury must then resolve the ambiguity."

Grier v. Brogdon, 234 Ga. App. 79, 80, 505 S.E.2d 512, 514 (1998) (footnotes omitted) (quoting Travelers Ins. Co. v. Blakely, 180 Ga. App. 520, 349 S.E.2d 474 (1986)). In addition, insurance contracts are construed against the insurer if the provisions are susceptible to more than one meaning. SawHorse, Inc. v. Southern Guar. Ins. Co. of Georgia, 269 Ga. App. 493,494-95, 604 S.E.2d 541, 544 (2004).

This court has previously addressed the inherent conflict with the definitions of "occurrence" and "personal injury" in the Policies. Since "occurrence" is defined as an accident and counter to the express definition of "personal injury," this court previously construed the inconsistencies against the insurer and concluded that coverage was warranted for the C's false imprisonment claims. Since coverage for personal injuries is subject to an occurrence, occurrence must necessarily also encompass actions constituting a false imprisonment. Thus, when

16

reviewing the statutory rules of construction and construing conflicting language against the insurer, an occurrence arises whenever an individual is falsely imprisoned. As such, this issue is one that can be determined by the court and does not need to be sent to a jury.

If there were one false imprisonment of one child by one defendant, the application of this matter would be rather straightforward. However, because there are allegedly multiple false imprisonments of two children during two policy periods, this matter is more complex. Since no Georgia court has previously made this determination, this court must rule in a manner in which it believes the Supreme Court of Georgia would rule. Towne Realty, Inc. v. Safeco. Ins. Co. of Am., 854 F.2d 1264, 1269 (11th Cir. 1988).

The plaintiffs in this matter contend that while there may be one occurrence per policy period, they are not responsible for paying any more than $600,000 in toto because the false imprisonments during each policy period were derived from "continuous or repeated exposure to substantially the same harmful conditions." In support of this contention, the plaintiffs direct this court to similar cases dealing with repeated acts of child molestation. See S.F. v. W. Am. Ins. Co., 250 Va. 461, 465, 463 S.E.2d 450, 452 (1995) (holding that repeated exposure to sexual molestation constitutes one occurrence per child who was molested

per policy period because sexual molestation of the same child multiple times constituted "continuous or repeated exposure to substantially the same general conditions."); <u>Soc'y of Roman Catholic Church v. Interstate Fire & Cas. Co.</u>, 26 F.3d 1359 (5th Cir. 1994) (same); <u>H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgy, PA</u>, 150 F.3d 526 (5th Cir. 1998) (molestation of two separate children during same policy period by same individual constitute two occurrences).

This court is not persuaded by any of these decisions because each court makes its decision based on varying state laws. Furthermore, in many of these decisions the courts attempt to place a square through a round hole by comparing intentional actions such as molestation to continuing torts such as lead, asbestosis, and chemical exposure. And a number of the courts use the cause theory when attempting to pinpoint the number of occurrences. <u>See generally</u> Michael P. Sullivan, Annotation, *What Constitutes Single Accident or Occurrence Within Liability Policy Limiting Insurer's Liability to a Specified Amount Per Accident or Occurrence*, 64 A.L.R. 4th 668 (1988).

As a preliminary matter, this court notes that it has been unable to locate any Georgia precedent expressing a preference for the "cause" or "effect" theories for determining the number of occurrences. However, it has found a decision from the United States Court of Appeals for the Fifth Circuit, interpreting Georgia

law, in which that court noted, "[W]e think it clear that the word 'accident' as used in the disputed phrase was intended to be construed from the point of view of the cause rather than the effect." Saint Paul-Mercury Indem. Co. v. Rutland, 225 F.2d 689, 692 (5th Cir. 1955).

Candidly, this court notes that it would prefer to have a much clearer expression of Georgia law before deciding this issue. The United States Court of Appeals for the Eleventh Circuit has previously rendered a decision in a case with similar issues as those present in the case at bar. Home Indem. Co. v. City of Mobile, 749 F.2d 659 (11th Cir. 1984). However, that case was based on an analysis of Alabama, rather than Georgia, law. Nevertheless, this court believes that the Georgia Supreme Court would rule in a similar manner and, thus, will analyze the number of occurrences using the cause theory.

In Home Indemnity, the Eleventh Circuit noted that Alabama courts use the cause theory of analyzing the meaning of occurrence in insurance policies. Id. at 662. Explaining this theory, the court noted that injuries stemming from one proximate cause constitute one occurrence. Id. "Thus, a single occurrence may result in multiple injuries to multiple parties over a period of time; but if one cause is interrupted and replaced by another intervening cause, the chain of causation is broken and more than one occurrence has taken place." Id.

19

Applying this standard to the facts of the case at bar, this court first notes that it does not believe that independent acts of false imprisonment arise out of "continuous or repeated exposure to substantially the same harmful conditions."  Though this language may indeed apply to torts which cause injuries through a series of repeated exposure, such as asbestosis or lead poisoning, it would be a stretch to rule that twenty-two distinct acts of taking the C's children to a room and forcing them to stay against their wills constitute one single act.  Though this court recognizes that several courts from other jurisdictions have ruled that repeated acts of sexual abuse to the same child constitute one occurrence per policy period, this court does not agree with those rulings.

Rather, under the cause theory, this court believes that the chain of causation was broken each time the C's children were released from imprisonment.  Thus, with respect to Joshua Davis, this court concludes that there was an occurrence each time he falsely imprisoned each child.[5]  This court does not agree with the plaintiffs' argument that the children should be viewed as one commodity.  Instead, this court views each child as an individual and the acts perpetrated against them as distinct acts.

With respect to Steven and Peggy Davis, this court concludes that there was an occurrence each time the C's children were

---

[5]  Thus, if it is proven that Joshua Davis imprisoned the C's children on 22 occasions, there would be 44 occurrences.

falsely imprisoned due to their negligence in failing to supervise them. This is, of course, assuming that the C's are able to prove that Steven and Peggy Davis' negligence was the cause of the C's children being falsely imprisoned. Thus, if Steven Davis was at work and Peggy Davis was in charge of supervising the C's children, or vice versa, each time she negligently failed to supervise the children and such negligence led to the children being falsely imprisoned, there would be one occurrence. Conversely, if both Steven and Peggy Davis were at home and were charged with supervising the C's children, there would be two occurrences since each parents' independent negligence caused the children's injuries.

Though this court is cognizant of the liability to which this interpretation exposes the plaintiffs, the parties to the contract are the master of their agreement and must be bound by its terms.

For the foregoing reasons, the plaintiffs' motion for summary judgment [Doc. No. 20] is GRANTED IN PART and DENIED IN PART and the defendants' C.C. and L.C., Individually and as Next Friends of M.C. and C.C., motion for summary judgment [Doc. No. 28] is GRANTED IN PART and DENIED IN PART.

SO ORDERED, this _20th_ day of July, 2005.

_____
ROBERT L. VINING, JR.
Senior United States District Judge